# UNITED STATES DISTRICT COURT
for the
Middle District of Florida – Ocala Division

| | |
|---|---|
| BRITNI WALSH and FRANKLIN EUGENE DUVALL JR., *Plaintiffs,*<br><br>-v-<br><br>CITY OF LEAGUE CITY, SHERIFF BILLY WOODS in his official capacity as Sheriff, KAILEIGH WALTON, HENRIK OSTHED, LEEF JEAN-FRANCOIS, and CLAYTON SHAW in their individual capacities, *Defendants.* | **Case No.5:26-cv-00545-AGM-PRL**<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND**[1] |

**CIVIL ACTION**

*This action alleges, inter alia, violations of the Fourth Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983, arising from the warrantless and non-consensual entry into Plaintiffs' home, the unlawful search and seizure of their property, the custodial detention and interrogation of Plaintiff Franklin Duvall without lawful authority, the prolonged twenty-one-day incarceration of Plaintiff Duvall without judicial justification, and the coordinated cross-state investigative conduct initiated in Texas and executed in Florida without valid warrants, judicial oversight, or statutory authorization, thereby infringing upon Plaintiffs' constitutional rights secured by the aforementioned provisions.*

Plaintiffs BRITNI WALSH and FRANKLIN EUGENE DUVALL JR., by and through undersigned counsel, LLG National Law Group, and bring this civil action for damages and equitable relief against Defendants CITY OF LEAGUE CITY; SHERIFF BILLY WOODS, in his official capacity as Sheriff of Marion County, Florida; KAILEIGH WALTON, HENRIK OSTHED, and LEEF JEAN-FRANCOIS, in their individual capacities; and CLAYTON SHAW, in his individual capacity, and allege as follows:

---

[1] This First Amended Complaint is filed in accordance with the Court's Endorsed Order (Doc. 36) dated 09/30/2026 dismissing the original Complaint (Doc. 1) without prejudice and granting leave for the Plaintiff to file an Amended Complaint by 10/05/2026.

## INTRODUCTION

1. This case arises from a coordinated cross-state investigation that began with Detective Clayton Shaw of the League City Police Department ("LCPD") in Texas and culminated in the warrantless, non-consensual entry into Plaintiffs' Florida home by deputies of the Marion County Sheriff's Office ("MCSO"), the seizure of property, damage to the residence, and the detention, interrogation, and twenty-one-day incarceration of Plaintiff FRANKLIN EUGENE DUVALL JR. ("Duvall"). MCSO records document that deputies entered the residence, located and detained Mr. Duvall, transported him to MCSO's Criminal Investigations Division, seized his cellular telephone, and ultimately secured the device in a Faraday bag for transfer in connection with the Texas investigation.

2. The MCSO records further demonstrate that these events arose from coordinated investigative activity between MCSO and Detective Shaw. Shaw initiated contact with MCSO concerning the Texas investigation, identified Mr. Duvall's Florida residence and electronic-account information, and requested investigative assistance. The records further reflect that Shaw and MCSO personnel developed an investigative strategy designed to obtain information without alerting Mr. Duvall to Shaw's investigation, including the use of a purported "swatting" scenario. MCSO thereafter conducted investigative activity in Florida and ultimately acted on information supplied in connection with Shaw's Texas investigation.

3. The circumstances surrounding Mr. Duvall's arrest and continued detention present separate constitutional issues. On March 7, 2025, MCSO records reflected that Texas had confirmed it would extradite Mr. Duvall. On March 25, however, the Galveston County Sheriff's Office notified MCSO that Texas would not be able to obtain a Governor's warrant because the underlying warrant was a Justice of the Peace ("JP") warrant and that Texas would not extradite Mr. Duvall at that time. MCSO subsequently advised the Florida court that the Texas hold was the

"only charge" for which Mr. Duvall remained in custody, and the court authorized release of the Texas hold. Mr. Duvall nevertheless remained incarcerated until March 28, 2025.

4. Plaintiffs seek relief for the constitutional and other legally cognizable injuries resulting from Defendants' conduct, including the unlawful entry into their home, unreasonable searches and seizures, deprivation of Mr. Duvall's liberty, and the resulting property and personal injuries. Plaintiffs further allege that the conduct of the individual Defendants and the municipal entities they served was undertaken pursuant to, or resulted from, coordinated investigative practices and actions that must be evaluated under the applicable constitutional and municipal-liability standards.

**JURISDICTION AND VENUE**

5. This action arises under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs seek redress for constitutional violations arising from the warrantless entry into their home, unreasonable searches and seizures, the detention and interrogation of Plaintiff Franklin Eugene Duvall Jr., and his subsequent incarceration.

6. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs assert claims arising under the Constitution and laws of the United States.

7. This Court has personal jurisdiction over Defendant Clayton Shaw because Shaw purposefully directed investigative conduct toward Florida, initiated and coordinated investigative activity with Florida law-enforcement personnel concerning Plaintiffs' Florida residence, and allegedly caused or participated in conduct giving rise to Plaintiffs' injuries in this District. Shaw's Florida-directed conduct constitutes a tortious act within Florida and falls within Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2). The exercise of specific personal jurisdiction over Shaw is also consistent with due process because his alleged Florida-directed conduct constitutes purposeful availment of, or purposeful direction toward, this forum and the claims arise directly

from that conduct.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Marion County, Florida, including the alleged entry into Plaintiffs' home, searches and seizures, detention, interrogation, and resulting injuries.

**PARTIES**

9. At all times relevant hereto, Plaintiff BRITNI WALSH was an adult resident of Marion County, Florida, and the homeowner and resident of 14515 SE 91st Court, Summerfield, Florida. Ms. Walsh maintained possessory rights to the residence that Defendants allegedly entered and damaged.

10. At all times relevant hereto, Plaintiff FRANKLIN EUGENE DUVALL, JR. was an adult resident of Marion County, Florida, and a co-tenant and resident of 14515 SE 91st Court, Summerfield, Florida. Mr. Duvall maintained possessory rights to the residence that Defendants allegedly entered.

11. At all times relevant hereto, Defendant CITY OF LEAGUE CITY, TEXAS was a municipal corporation organized under the laws of the State of Texas. The City may be served at its public office located at 300 W. Walker Street, League City, Texas 77573.

12. At all times relevant hereto, Defendant SHERIFF BILLY WOODS was the elected Sheriff of Marion County, Florida. Sheriff Woods is sued in his official capacity with respect to the policies, customs, practices, training, supervision, and other municipal conduct alleged herein. He may be served through the Marion County Sheriff's Office, 692 NW 30th Avenue, Ocala, Florida 34475.

13. At all times relevant hereto, Defendant DETECTIVE KAILEIGH WALTON was a detective with the Marion County Sheriff's Office. Detective Walton is sued in her individual

capacity for actions taken under color of state law, including her alleged participation in the entry into Plaintiffs' residence, detention of Mr. Duvall, interrogation, and seizure of property.

14. At all times relevant hereto, Defendant DETECTIVE HENRIK OSTHED was a detective with the Marion County Sheriff's Office. Detective Osthed is sued in his individual capacity for actions taken under color of state law, including his alleged participation in the entry into Plaintiffs' residence, detention of Mr. Duvall, interrogation, and seizure of property.

15. At all times relevant hereto, Defendant CORPORAL LEEF JEAN-FRANCOIS was a corporal with the Marion County Sheriff's Office. Corporal Jean-Francois is sued in his individual capacity for actions taken under color of state law, including his alleged participation in the detention and transport of Mr. Duvall and subsequent handling of the matter at the MCSO Criminal Investigations Division and Marion County Jail.

16. At all times relevant hereto, Defendant DETECTIVE CLAYTON SHAW was a detective with the League City Police Department in Texas. Detective Shaw is sued in his individual capacity for his alleged participation in initiating and coordinating investigative activity directed toward Florida and Plaintiffs' Florida residence. The MCSO investigative records identify Shaw as the Texas detective who initiated contact with MCSO concerning the investigation, identified the Florida residence and related electronic-account information, requested investigative assistance, and participated in the investigative strategy that preceded the actions taken by MCSO personnel in Florida.

**FACTUAL BACKGROUND**

17. On December 19, 2024, Defendant Detective Clayton Shaw of the League City Police Department ("LCPD") contacted the Marion County Sheriff's Office ("MCSO") concerning a Texas sexual-offense investigation involving a subject in Summerfield, Florida and a girl in Texas. The MCSO investigative report states that Shaw was "requesting assistance with

a sexual-offense investigation involving a subject in Summerfield, Florida and a girl in Texas."

18. Defendant Shaw provided MCSO with identifying information concerning the Florida subject, including the Florida residence, the Discord username "Steveman1555," the associated email address, and a suspected telephone number. MCSO thereafter undertook investigative activity concerning the Florida residence and its occupants in connection with Shaw's Texas investigation.

19. MCSO records reflect that deputies reviewed prior calls for service and other database information concerning the residence and its occupants. The investigation was conducted without Plaintiffs being informed that MCSO was assisting Shaw with an ongoing Texas investigation.

20. On January 8, 2025, MCSO deputies went to Plaintiffs' residence and conducted an in-person encounter with Plaintiff Franklin Eugene Duvall Jr. ("Duvall"). According to the MCSO investigative report, MCSO personnel had previously discussed with Detective Shaw how to obtain information from the Florida resident "without making his suspect aware of Detective Shaw's investigation." The report states that the officers determined that asking questions concerning an alleged "swatting" report would be the best way to obtain information through a non-custodial interview without arousing suspicion.

21. During the January 8 encounter, Mr. Duvall cooperated with the deputies, retrieved his cellular telephone, and permitted deputies to view and photograph information associated with his Discord account. The MCSO report does not describe the January 8 encounter as a custodial detention.

22. Although the narrative describes the January 8 encounter as cooperative, the property section of the MCSO report identifies a cellular telephone as "SEIZED." The report further reflects that the investigation remained connected to Detective Shaw and the Texas

investigation. MCSO policy separately requires constitutional safeguards when searching cellular devices and requires a warrant for a search of a cellular telephone even when the device has been lawfully seized.

23. The MCSO report does not identify an actual 911 call or other contemporaneous emergency event underlying the "swatting" explanation. Instead, the report expressly describes the "swatting" scenario as an investigative strategy selected to obtain information without alerting Mr. Duvall to Detective Shaw's Texas investigation.

24. Plaintiffs were not informed during the January 8 encounter that MCSO was assisting Detective Shaw with a Texas investigation or that information obtained during the encounter was being gathered in connection with that investigation.

25. On March 7, 2025, Defendants Kaileigh Walton and Henrik Osthed returned to Plaintiffs' residence to locate Mr. Duvall in connection with a Texas fugitive warrant. The MCSO report states: "Detective Osthed and I responded… in reference to locating subject Duvall on his felony warrant issued by Detective Shaw."

26. MCSO CAD records identify Osthed as the primary responding deputy and Walton as a secondary responding deputy. The CAD records further reflect that MCSO confirmed that Texas purportedly "WILL EXTRADITE" Mr. Duvall and identified the Texas offense and a $60,000 bond.

27. Deputies knocked at the residence and then moved toward the rear of the home. Plaintiffs allege that deputies entered the residence without consent, without a search warrant, and without exigent circumstances. The entry resulted in physical damage to the door, deadbolt, and door frame, requiring repairs, replacement of locks, and additional security measures.

28. Plaintiff Walsh was not present when the deputies entered the residence and did not authorize their entry. Plaintiff Duvall was present but did not knowingly, intelligently, or

voluntarily consent to the deputies' entry into the residence.

29. After entering the residence, deputies located Mr. Duvall, handcuffed him, and took him into custody. Deputies transported him first in an unmarked vehicle and then to the MCSO Criminal Investigations Division ("CID") for further investigation and questioning.

30. At CID, MCSO personnel continued questioning Mr. Duvall concerning the Texas investigation. MCSO records reflect that deputies obtained the password to Mr. Duvall's cellular telephone, seized the device, placed it in a Faraday bag, and secured it "to be submitted into evidence and sent to League City Police Department."

31. Mr. Duvall was thereafter booked into the Marion County Jail. He remained incarcerated for approximately twenty-one days, until March 28, 2025.

32. The circumstances surrounding Mr. Duvall's continued confinement changed materially after his arrest. On March 25, 2025, the Galveston County Sheriff's Office transmitted a teletype to MCSO concerning Mr. Duvall. The teletype requested that MCSO remove the Texas detainer and stated: "WE WILL NOT BE ABLE TO GET A GOVERNORS WARRANT DUE TO WARRANT BEING A JP WARRANT" and "WE WILL NOT EXTRADITE AT THIS TIME."

33. On the same date, MCSO Inmate Records Specialist Alexandria Warner transmitted a written request to the Florida court concerning Mr. Duvall's continued confinement. The MCSO request stated that Mr. Duvall was being held at the Marion County Jail "on a Fugitive from Justice Charge out of Texas," that MCSO had received a teletype from Texas stating that Texas no longer wished to extradite Mr. Duvall from Florida, and that the Texas hold was the "only charge" for which Mr. Duvall remained in custody. MCSO requested permission to release the Texas hold.

34. The Florida court responded "Ok to release" on March 25, 2025. The court docket

also reflects that an extradition matter was heard that day and that a previously scheduled extradition hearing was removed. Mr. Duvall nevertheless remained incarcerated until March 28, 2025.

35. Plaintiffs do not allege that the Texas justice-of-the-peace warrant was necessarily void or that it could not, under any circumstances, provide a basis for an initial fugitive arrest in Florida. Rather, Plaintiffs allege that the documented circumstances surrounding the warrant, the representations that Texas would extradite, the subsequent withdrawal of Texas's detainer, and the Florida court's authorization to release the Texas hold present distinct questions concerning the legal basis for Mr. Duvall's arrest, the subsequent search and seizure of his person and property, and the duration of his continued confinement.

36. Detective Shaw was the Texas detective who initiated the investigation, contacted MCSO concerning Mr. Duvall, supplied information concerning Mr. Duvall and his Florida residence, and obtained the Texas warrant on which MCSO relied in taking Mr. Duvall into custody. Given his role in obtaining the warrant and coordinating the investigation with MCSO, Shaw knew or reasonably should have known the nature of the warrant and whether it provided the documentation necessary for Texas to pursue extradition from Florida. Nevertheless, Shaw initiated and coordinated the Florida investigation and caused or contributed to MCSO personnel acting upon the warrant before Texas ultimately advised MCSO that it could not obtain a Governor's warrant because the underlying warrant was a justice-of-the-peace warrant and that Texas would not extradite Mr. Duvall at that time.

37. MCSO's written policies governing arrest warrants and fugitive arrests required deputies to verify an out-of-state warrant and the originating agency's agreement to extradite. MCSO policy further provides that "[i]f the agency will not extradite, the arrest should not be made." MCSO policy also requires constitutional compliance in investigative and custodial

activity and establishes procedures governing the execution of arrest warrants and residential entry.

38. The conduct alleged herein was connected to the Texas investigation initiated by Detective Shaw. MCSO records identify Shaw as the Texas detective who contacted MCSO, supplied information concerning the Florida subject and residence, and coordinated investigative activity with MCSO personnel before the March 7 arrest.

39. The MCSO records further reflect that the cellular telephone seized from Mr. Duvall was secured for submission into evidence and transfer to the League City Police Department, connecting the Florida seizure to the Texas investigation initiated by Shaw.

40. Plaintiff Walsh was not present when Mr. Duvall was taken into custody. She subsequently returned to the residence and discovered the physical damage resulting from the entry and that Mr. Duvall had been taken into law-enforcement custody.

41. As a result of the events described herein, Mr. Duvall suffered loss of liberty, invasion of privacy, emotional distress, and other injuries. Plaintiff Walsh suffered loss of privacy and security in her home, emotional distress, and expenses associated with counseling and repairs to the residence.

42. Plaintiffs incurred expenses associated with repairing the residence, replacing locks, and implementing additional security measures following the March 7 entry.

**COUNT I**
**FOURTH AMENDMENT: UNLAWFUL ENTRY - 42 U.S.C. § 1983**
***(Against Defendants Walton and Osthed in Their Individual Capacities)***

43. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures in their homes. A warrantless entry into a private residence is presumptively unreasonable absent consent, exigent circumstances, or another recognized exception to the warrant requirement.

44. At all times relevant, Defendants Kaileigh Walton and Henrik Osthed were acting under color of state law as sworn deputies of the Marion County Sheriff's Office ("MCSO").

45. On March 7, 2025, Defendants Walton and Osthed approached Plaintiffs' residence at 14515 SE 91st Court, Summerfield, Florida, in an effort to locate Plaintiff Franklin Duvall in connection with a Texas warrant obtained by Detective Clayton Shaw of the League City Police Department. The MCSO incident report states: "Detective Osthed and I responded… in reference to locating subject Duvall on his felony warrant issued by Detective Shaw."

46. After receiving no response to their initial knocking, Defendants Walton and Osthed moved to the rear of the residence, continued knocking and shouting, and ultimately entered the residence without a search warrant, without consent, and without exigent circumstances.

47. The Complaint does not challenge the Texas warrant as categorically void or contend that an out-of-state arrest warrant can never support an arrest in Florida. Rather, Plaintiffs allege that the warrant did not, under the circumstances alleged here, provide Walton and Osthed with lawful authority to make a warrantless, nonconsensual entry into Plaintiffs' residence absent an applicable exception to the Fourth Amendment's warrant requirement.

48. No emergency existed, no threat to life or safety was present, and no exigent circumstances justified bypassing the warrant requirement. Plaintiff Walsh was not home and had not authorized Defendants to enter the residence. Plaintiff Duvall likewise did not provide knowing, intelligent, and voluntary consent to the entry.

49. The forced entry caused physical damage to Plaintiffs' door, deadbolt, and door frame, requiring repairs, lock replacement, and security measures.

50. After entering the residence, Defendants Walton and Osthed located Plaintiff Duvall and seized him. The seizure occurred inside Plaintiffs' residence and was part of the same

warrantless entry undertaken to execute the Texas warrant.

51. The circumstances surrounding the entry further demonstrate that Defendants were conducting an investigative operation rather than responding to an emergency. The MCSO incident report documents discussion of the "swatting" narrative during the encounter, which Plaintiffs allege was part of the investigative strategy previously developed in connection with the Texas investigation.

52. Defendants Walton and Osthed therefore entered Plaintiffs' residence without a constitutionally sufficient basis for the warrantless residential entry, thereby violating Plaintiff Duvall's Fourth Amendment rights and Plaintiff Walsh's Fourth Amendment rights in her home.

53. As a direct and proximate result of the unlawful entry, Plaintiff Walsh suffered property damage, loss of security and privacy in her home, emotional distress, and other compensable injuries. Plaintiff Duvall suffered the unlawful seizure of his person, emotional distress, and loss of liberty resulting from the unconstitutional entry and seizure.

54. Plaintiffs seek compensatory damages, punitive damages against the individual defendants to the extent permitted by law, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all other relief to which they are entitled.

## COUNT II
## FOURTH AMENDMENT: UNLAWFUL SEARCH & SEIZURE
***(Against Walton, Osthed, and Jean-Francois in Their Individual Capacities)***

55. The Fourth Amendment, as incorporated against the States through the Fourteenth Amendment, guarantees the right of individuals to be free from unreasonable searches and seizures of their persons, homes, and effects.

56. At all times relevant, Defendants Kaileigh Walton, Henrik Osthed, and Leef Jean-Francois were acting under color of state law as sworn deputies of the Marion County Sheriff's Office ("MCSO").

57. On January 8, 2025, Defendant Walton conducted an in-person encounter at Plaintiffs' residence in connection with the investigation initiated by Detective Clayton Shaw of the League City Police Department. The MCSO incident report states: "We determined that asking questions in reference to an alleged 'swatting' report would be the best way to obtain information in a non-custodial interview without suspicion."

58. The "swatting" report presented to Plaintiff Duvall was not the actual investigative purpose of the encounter. Rather, Defendant Walton used the purported report as a means of obtaining information from Duvall without alerting him to the Texas investigation being conducted by Detective Shaw and the League City Police Department.

59. During the encounter, Defendant Walton directed or requested that Plaintiff Duvall retrieve his cellular telephone and open the Discord application. Duvall complied in the context of the law-enforcement encounter created through the "swatting" representation. Plaintiffs allege that Duvall's compliance was not knowing, voluntary, and unequivocal consent to a warrantless search of his cellular telephone or its digital contents, because the purported basis for the encounter materially concealed the actual investigative purpose for which the information was being sought.

60. Defendant Walton thereafter viewed and photographed information displayed through the Discord application on Plaintiff Duvall's cellular telephone. Walton did so without a warrant or other judicial authorization and without circumstances establishing a lawful exception to the Fourth Amendment's warrant requirement.

61. MCSO's Legal Bulletin 2022-18 expressly provides that a warrant is required to search a cellular telephone even when the device has been lawfully seized. Defendant Walton's conduct was inconsistent with MCSO's own directive and with the Fourth Amendment's protections governing digital information contained on cellular telephones.

62. On March 7, 2025, Defendants Walton and Osthed returned to Plaintiffs' residence

in connection with the Texas investigation and located Plaintiff Duvall inside the residence.

63. During the March 7 encounter, Defendants Walton and Osthed seized Plaintiff Duvall's cellular telephone and obtained the password to the device. The telephone was then placed in a Faraday bag.

64. The MCSO incident report states that the telephone "will be submitted into evidence and sent to League City Police Department," demonstrating that the device was seized for the purpose of obtaining and transferring evidence in furtherance of Detective Shaw's Texas investigation.

65. Plaintiffs allege that Defendants seized and retained Plaintiff Duvall's cellular telephone and thereafter sought access to, or caused access to, the digital contents of the device without a warrant authorizing such search, without voluntary consent, and without a lawful exception to the warrant requirement.

66. At the time Defendants seized Plaintiff Duvall's cellular telephone, they were acting in connection with an out-of-state fugitive investigation and had not obtained or confirmed the warrant and extradition information required under applicable MCSO procedures for the execution of an out-of-state fugitive matter. MCSO policy required verification of the warrant, the underlying charge, bond, and the originating agency's agreement to extradite before proceeding with a fugitive arrest.

67. The subsequent events confirmed the significance of that failure. On March 25, 2025, the Galveston County Sheriff's Office instructed MCSO to remove its detainer and advised that Texas would not be able to obtain a Governor's warrant because the underlying warrant was a justice-of-the-peace warrant and that Texas would not extradite Plaintiff Duvall at that time.

68. The seizure and intended evidentiary transfer of Plaintiff Duvall's cellular telephone therefore occurred in circumstances in which Defendants had not obtained Florida

judicial authorization for the investigative seizure and search of the device and were acting to preserve and transfer the device as evidence for the Texas investigation.

69. To the extent Defendants accessed, searched, photographed, extracted, or caused the extraction of information from Plaintiff Duvall's cellular telephone beyond the information specifically displayed during the January 8 encounter, such conduct constituted an unreasonable search of digital information protected by the Fourth Amendment.

70. Defendants Walton, Osthed, and Jean-Francois therefore violated Plaintiff Duvall's Fourth Amendment rights by participating in the unlawful seizure of his cellular telephone and, to the extent alleged above, the warrantless search and acquisition of information contained therein.

71. As a direct and proximate result of Defendants' unlawful searches and seizures, Plaintiff Duvall suffered loss of privacy in his personal digital information, interference with and loss of possession of his personal property, emotional distress, and other compensable injuries.

72. Plaintiffs seek compensatory damages, punitive damages against the individual Defendants to the extent permitted by law, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all other relief to which they are entitled.

## COUNT III
## UNLAWFUL AND PROLONGED DETENTION OF PLAINTIFF DUVALL - 42 U.S.C. § 1983

***(Against Walton, Osthed, and Jean-Francois in Their Individual Capacities)***

73. The Fourth Amendment protects against unreasonable seizures of the person, including arrest and continued detention unsupported by probable cause or other lawful authority. The Fourteenth Amendment makes that protection applicable to state and local officials.

74. At all relevant times, Defendants Walton, Osthed, and Jean-Francois were sworn MCSO deputies acting under color of state law.

75. On March 7, 2025, Walton and Osthed located Duvall inside his residence and seized him in connection with an out-of-state Texas fugitive matter initiated by Detective Shaw.

76. Walton and Osthed handcuffed Duvall, removed him from his residence, transported him to the MCSO Criminal Investigations Division, and thereafter caused him to be transported to the Marion County jail.

77. The arrest and detention were undertaken in connection with an out-of-state fugitive matter. MCSO's applicable fugitive-arrest procedures required deputies to verify the identity of the person sought, the underlying charge and warrant, the bond, and the originating agency's agreement to extradite before proceeding with the arrest.

78. Defendants failed to comply with those requirements before seizing Duvall. In particular, Defendants did not obtain the required verification establishing that the originating jurisdiction continued to seek Duvall's extradition before proceeding with his arrest and detention.

79. Plaintiffs do not allege that Florida law categorically prohibits a warrantless arrest of a person based upon an out-of-state charge. Florida Statutes § 941.14 permits a warrantless fugitive arrest upon reasonable information that the person is charged in another state with a qualifying offense, but requires that the person be taken before a judge with all practicable speed and thereafter subjected to the statutory extradition process.

80. Defendants nevertheless detained Duvall from March 7 through March 28, 2025, a period of approximately twenty-one days, while the legal basis for his continued confinement remained unresolved.

81. Duvall was brought before the court for an initial appearance on March 8, 2025. Although that proceeding addressed his initial detention and imposed conditions concerning the Texas matter, it did not resolve whether Texas would seek or could obtain his extradition, nor did it eliminate the statutory requirements governing his continued confinement as an alleged fugitive.

82. On March 25, 2025, the extradition issue materially changed. Galveston County Sheriff's Office notified MCSO that the Texas detainer should be removed, that Texas would not

be able to obtain a Governor's warrant because the underlying warrant was a justice-of-the-peace warrant, and that Texas would not extradite Duvall at that time.

83. MCSO thereafter informed the Florida court that Duvall was being held on the Texas fugitive matter, that Texas no longer wished to extradite him, and that the Texas hold was the only remaining basis for his continued confinement.

84. On March 25, 2025, the court authorized Duvall's release.

85. Despite the demanding jurisdiction's withdrawal of its extradition request, MCSO's notification to the court that the Texas hold was the only remaining basis for confinement, and the court's authorization of release, Duvall nevertheless remained incarcerated until March 28, 2025.

86. From the point at which the Texas extradition basis had been withdrawn and the court had authorized release through March 28, Defendants continued to restrain Duvall's liberty without a continuing lawful basis for doing so.

87. Defendants' continued detention of Duvall after March 25 constituted an unreasonable seizure in violation of the Fourth Amendment.

88. To the extent Defendants contend that Duvall's initial detention was authorized by Florida's interstate-extradition procedures, those procedures did not authorize Defendants to continue holding Duvall after the demanding jurisdiction withdrew its request for extradition and the Florida court authorized his release.

89. Defendants Walton, Osthed, and Jean-Francois participated in, caused, or continued Duvall's detention to the extent each participated in his processing, custody, or continued confinement after receiving information that the Texas matter no longer supported his continued detention.

90. As a direct and proximate result of Defendants' unlawful detention, Duvall suffered loss of liberty, emotional distress, humiliation, fear, disruption of his personal and family life, and

other compensable damages.

91. Defendants' conduct, particularly their continued detention of Duvall after being informed that Texas would not extradite and after the court authorized his release, was undertaken with reckless or deliberate disregard for Duvall's constitutional rights, supporting an award of punitive damages against the individual Defendants to the extent permitted by law.

92. Duvall is entitled to recover compensatory damages, punitive damages against the individual Defendants where permitted, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, and all other relief permitted by law.

**COUNT IV**
**MONELL LIABILITY – SHERIFF BILLY WOODS (OFFICIAL CAPACITY)**
**42 U.S.C. § 1983**

93. Defendant Billy Woods was, at all relevant times, the Sheriff of Marion County and the official responsible for the policies, procedures, training, supervision, and implementation of MCSO law-enforcement operations relevant to the conduct alleged herein. Plaintiffs bring this claim against Woods in his official capacity for the policies, customs, practices, and failures attributable to MCSO.

94. MCSO employees acted under color of state law when they entered Plaintiffs' residence, arrested and detained Duvall, seized and handled his cellular telephone, and conducted investigative and evidentiary activities in coordination with the League City Police Department.

95. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a governmental entity may be liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy, widespread custom or practice, or a deliberately indifferent failure to train or supervise that is the moving force behind the constitutional injury. Plaintiffs allege that the constitutional violations described in Counts I through III resulted from MCSO policies, customs, practices, and deficiencies in implementing, enforcing, training, and supervising its deputies.

96. MCSO maintained written policies governing arrests, fugitive investigations, warrant verification, searches, electronic-device evidence, custodial questioning, and cooperation with outside law-enforcement agencies. Those policies demonstrate that MCSO recognized the constitutional and legal safeguards applicable to the conduct at issue.

97. In particular, MCSO Policy 4042.00 required deputies handling arrest warrants and fugitive matters to verify the identity of the subject, the underlying charge or warrant, applicable bond information, and the originating agency's agreement to extradite. The policy further required appropriate confirmation concerning extradition and provided that, if the originating agency would not extradite, the arrest should not be made.

98. Plaintiffs allege that Walton and Osthed nevertheless proceeded on March 7, 2025, to arrest Duvall in connection with the Texas fugitive matter without first completing the verification and extradition-confirmation procedures required by MCSO's own policy.

99. That failure was particularly material because the investigation originated in another state and the arrest involved an out-of-state fugitive matter whose continued extradition depended upon the demanding jurisdiction.

100. MCSO also maintained Legal Bulletin 2022-18, which required a warrant to search a cellular telephone even where the telephone had been lawfully seized. Despite that directive, Walton participated in the January 8, 2025, encounter during which Duvall was induced to retrieve and provide access to his cellular telephone in connection with the purported "swatting" investigation, and Walton viewed and photographed information displayed through the device while the actual investigative purpose concerning the Texas investigation was allegedly concealed from Duvall.

101. On March 7, 2025, Walton and Osthed again seized Duvall's cellular telephone, obtained his password, and placed the telephone in a Faraday bag for preservation and transfer.

The MCSO report stated that the telephone would be submitted into evidence and sent to the League City Police Department.

102. Plaintiffs allege that these events demonstrate deficiencies in MCSO's training, supervision, and enforcement of its existing safeguards concerning cellular-device searches and seizures, particularly when MCSO personnel were acting in coordination with an out-of-state law-enforcement agency.

103. Plaintiffs further allege that MCSO failed adequately to train and supervise its deputies concerning, among other things:

a. the constitutional limitations governing warrantless entry into a private residence;

b. the distinction between authority to arrest a fugitive and authority to enter a residence without a warrant, consent, or exigent circumstances;

c. the procedures required to verify an out-of-state warrant and the originating agency's continuing agreement to extradite;

d. the statutory and constitutional requirements governing continued detention of an alleged fugitive;

e. the requirement for judicial authorization before searching the contents of a cellular telephone;

f. the constitutional limitations governing seizure and preservation of electronic devices;

g. the limitations on investigative cooperation with out-of-state agencies;

h. the requirement that deputies reassess the legal basis for continued detention when the demanding jurisdiction withdraws or declines extradition; and

i. the obligation of supervisors to enforce existing constitutional safeguards rather

than permit them to be disregarded in individual investigations.

104. The alleged deficiencies were particularly significant because MCSO had already adopted written safeguards addressing the precise areas of conduct at issue. Plaintiffs allege that the deficiency therefore included MCSO's failure to adequately train, supervise, monitor, and discipline personnel in the implementation and enforcement of those safeguards.

105. Upon information and belief, before March 7, 2025, MCSO and its policymakers had received notice, through prior complaints, civil-rights litigation, administrative investigations, judicial proceedings, and other reports, concerning alleged unconstitutional arrests, warrantless searches or seizures, failures to follow constitutional safeguards, and deficiencies in the supervision or training of MCSO personnel.

106. Plaintiffs presently lack access to the internal MCSO records necessary to identify the full scope, number, circumstances, disposition, and supervisory response to those prior incidents because those records are within Defendants' possession, custody, or control. Plaintiffs therefore plead these facts upon information and belief and will amend or supplement these allegations as discovery permits.

107. Publicly available court records and other reports also reflect that MCSO personnel and policymakers have previously faced allegations involving arrests, searches, seizures, and supervisory or training deficiencies. Plaintiffs allege, upon information and belief, that MCSO policymakers knew of these matters before March 7, 2025, yet failed to adequately implement, enforce, or reinforce safeguards sufficient to prevent a recurrence of constitutional violations.

108. Plaintiffs do not rely upon any single prior incident as establishing a widespread custom. Rather, Plaintiffs allege that the March 7, 2025, constitutional violations occurred against the backdrop of MCSO's existing written policies, the alleged failure to implement and enforce those policies, prior notice of similar constitutional concerns, and deficiencies in training and

supervision within the control of MCSO policymakers.

109. The constitutional deficiencies continued after Duvall's arrest. On March 25, 2025, the Galveston County Sheriff's Office notified MCSO that the Texas detainer should be removed and advised that Texas could not obtain a Governor's warrant because the underlying warrant was a Justice of the Peace warrant and that Texas would not extradite Duvall at that time.

110. MCSO thereafter informed the Florida court that Duvall was being held on the Texas fugitive matter, that Texas no longer wished to extradite him, and that the Texas hold was the only remaining basis for his continued confinement.

111. The Florida court authorized Duvall's release on March 25, 2025, yet Duvall remained incarcerated until March 28, 2025.

112. Upon information and belief, MCSO lacked adequate supervisory procedures requiring prompt reassessment and termination of detention when the demanding jurisdiction withdrew its request for extradition or otherwise ceased to provide a continuing basis for the fugitive hold.

113. The foregoing conduct supports Plaintiffs' allegation that MCSO's deficiencies were not confined to a single deputy's isolated mistake, but included institutional failures concerning the implementation, enforcement, supervision, and training associated with fugitive arrests, residential entry, electronic-device searches and seizures, interstate investigative cooperation, and continued detention.

114. Plaintiffs further provided MCSO and Sheriff Woods with specific post-incident notice of the constitutional violations alleged herein. On July 2, 2025, Plaintiffs, through counsel, served a written Notice of Claim upon Sheriff Woods and MCSO concerning the March 7, 2025, incident and related conduct.

115. The Notice of Claim specifically identified, among other matters, the alleged

unlawful entry into Plaintiffs' residence, Duvall's arrest and detention, the interrogation of Duvall, the seizure and handling of his cellular telephone, the transfer of evidence to the League City Police Department, and the coordination between MCSO and League City personnel. The Notice also demanded preservation of evidence relating to the incident.

116. MCSO acknowledged receipt of the Notice of Claim on August 1, 2025, thereby confirming that MCSO had actual notice of the specific allegations concerning the conduct at issue.

117. Plaintiffs do not allege that the July 2, 2025, Notice of Claim establishes that MCSO had pre-incident knowledge of the March 7, 2025, violations. Rather, the Notice establishes that, after the incident, MCSO and its policymakers were placed on specific notice of the alleged constitutional violations and were afforded an opportunity to investigate, correct, and prevent recurrence of the alleged misconduct.

118. Upon information and belief, despite receiving that specific notice, MCSO failed adequately to investigate and correct the deficiencies identified in the Notice of Claim, including deficiencies concerning fugitive-arrest verification, residential entry, cellular-device seizure and search, interstate investigative coordination, and continued detention.

119. The policies, customs, practices, failures to train, failures to supervise, and failures to enforce constitutional safeguards described above were a moving force behind the violations of Plaintiffs' rights alleged in Counts I through III.

120. As a direct and proximate result of these policies, customs, practices, and institutional deficiencies, Plaintiffs suffered violations of their rights under the Fourth Amendment, including Duvall's rights against unreasonable residential entry, unreasonable search and seizure, and unreasonable detention, and Walsh's Fourth Amendment rights arising from the unlawful entry and seizure-related conduct occurring within her residence.

121. Taken together, the foregoing facts plausibly establish that the constitutional

violations alleged in Counts I through III were caused by MCSO policies, customs, practices, inadequate implementation of existing policies, and/or deliberately indifferent failures to train and supervise its personnel.

122. As a direct and proximate result of the policies, customs, practices, and failures described above, Plaintiffs sustained the injuries and damages alleged in Counts I through III and are entitled to recover compensatory damages, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**COUNT V**
**MONELL LIABILITY – CITY OF LEAGUE CITY**

123. Defendant City of League City, Texas ("League City") is a municipal corporation and governmental entity subject to suit under 42 U.S.C. § 1983. Plaintiffs bring this claim against League City for constitutional violations caused by its policies, customs, practices, and deliberately indifferent failures to train and supervise its police personnel.

124. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be liable under 42 U.S.C. § 1983 when a constitutional violation results from an official policy, widespread custom or practice, or a deliberately indifferent failure to train or supervise that is the moving force behind the constitutional injury.

125. League City, acting through its police department and its policymakers, maintained policies, customs, practices, and supervisory deficiencies governing the manner in which its officers conducted investigations involving persons and evidence located outside Texas and coordinated investigative activity with law-enforcement agencies in other jurisdictions.

126. Detective Clayton Shaw, acting under color of state law and within the scope of his duties as a League City police detective, initiated the investigation that resulted in the March 7, 2025, seizure and detention of Plaintiff Duvall in Florida. The MCSO incident report identifies Shaw as the Detective who requested MCSO assistance, identifies the matter as an "Assisting

Other Agency" investigation, and documents communications between Shaw and MCSO personnel concerning the investigation of Duvall. The report further identifies Shaw's Texas warrant as the basis for the March 7, 2025, effort to locate and arrest Duvall at his Florida residence.

127. The MCSO report further documents that Walton communicated with Shaw about how to obtain information from Duvall without alerting him to the actual purpose of the investigation. According to the report, MCSO personnel determined that questioning Duvall about an alleged "swatting" report would allow them to obtain information during a purportedly non-custodial encounter without arousing his suspicion. Plaintiffs allege that this investigative strategy was undertaken in connection with Shaw's League City investigation and resulted in MCSO personnel obtaining information and evidence from Duvall in Florida for use in the Texas investigation.

128. Plaintiffs further allege that League City personnel accepted, requested, or utilized information and evidence obtained by MCSO through investigative activity occurring in Florida, including Duvall's cellular telephone. During the March 7, 2025, encounter, MCSO personnel obtained Duvall's telephone password and placed the telephone in a Faraday bag for preservation. The MCSO report further stated that the telephone was to be submitted into evidence and transferred to the League City Police Department. Thus, the Florida seizure and handling of Duvall's telephone occurred as part of the interstate investigation initiated by Shaw and was specifically connected to the League City Police Department.

129. League City maintained or permitted a policy, custom, or practice under which its officers could coordinate investigative activity with out-of-state law-enforcement agencies without adequate procedures requiring officers to ensure that constitutional safeguards and the receiving state's jurisdictional requirements were observed before directing, requesting, or accepting

investigative action in that jurisdiction.

130. League City failed adequately to train and supervise its officers, including Shaw, concerning:

a. the constitutional limitations governing investigations involving persons and property located outside the officer's jurisdiction;

b. the distinction between conducting an investigation from Texas and directing, requesting, or causing law-enforcement action to occur within another state;

c. the requirement that searches and seizures conducted by cooperating law-enforcement agencies comply with the Fourth Amendment;

d. the constitutional limitations governing custodial interrogation and the acquisition of information or evidence from persons subjected to law-enforcement custody;

e. the legal requirements governing interstate investigative cooperation; and

f. the obligation to ensure that evidence obtained through an out-of-state investigation was acquired through constitutionally and legally permissible means.

131. Plaintiffs allege these deficiencies were material because the League City investigation expressly involved a Florida resident, a Florida residence, and Florida law-enforcement personnel acting at the request of, or in coordination with, League City personnel. The foreseeable consequence of failing to establish and enforce appropriate safeguards was that League City officers could cause or facilitate unconstitutional searches, seizures, entries, interrogations, or detentions in another jurisdiction.

132. Upon information and belief, before March 7, 2025, League City and its policymakers had received notice, through prior complaints, civil-rights litigation, administrative

proceedings, judicial proceedings, and other reports, concerning alleged constitutional violations arising from investigative practices, searches and seizures, custodial questioning, supervisory failures, or inadequate training of League City police personnel. Plaintiffs presently lack access to the City's internal records necessary to identify the full scope, number, circumstances, disposition, and supervisory response to such matters and therefore plead these facts upon information and belief.

133. Plaintiffs do not rely upon any single prior incident as establishing a widespread custom. Rather, Plaintiffs allege that the constitutional violations described herein occurred in the context of League City's policies, customs, practices, training, supervision, and handling of interstate investigative activity, including the manner in which Shaw and League City coordinated with MCSO concerning Duvall.

134. League City's policymakers further had authority to establish, implement, supervise, and enforce policies governing its officers' investigative conduct and coordination with outside law-enforcement agencies. Upon information and belief, League City failed adequately to exercise that authority to ensure that officers participating in interstate investigations complied with constitutional requirements and applicable jurisdictional limitations.

135. To the extent League City or its policymakers received information concerning the manner in which Shaw and other League City personnel participated in the investigation of Duvall, Plaintiffs allege that the City's failure to adequately investigate, correct, supervise, or discipline the conduct further demonstrates deficiencies in its implementation and enforcement of constitutional safeguards.

136. The policies, customs, practices, failures to train, failures to supervise, and failures to enforce constitutional safeguards described above were a moving force behind the constitutional violations alleged in Counts I through III, including the unlawful entry into Plaintiffs' residence,

the unlawful search and seizure of Duvall's cellular telephone, and Duvall's unlawful detention and interrogation.

137. League City's policies, customs, practices, and institutional deficiencies caused League City personnel to participate in, facilitate, or knowingly utilize investigative conduct occurring in Florida that Plaintiffs allege violated their rights under the Fourth Amendment.

138. As a direct and proximate result of League City's policies, customs, practices, and institutional deficiencies, Plaintiffs suffered the injuries and damages alleged in Counts I through III, including property damage, loss of property, unlawful entry, search, seizure, and detention protected by the Fourth Amendment, emotional distress, financial losses, and other damages recoverable under applicable law.

139. Plaintiffs are entitled to recover compensatory damages, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## COUNT VI
## FAILURE TO TRAIN AND SUPERVISE – 42 U.S.C. § 1983
***(Against Sheriff Woods in His Official Capacity)***

140. At all times relevant, Defendant Sheriff Billy Woods, sued in his official capacity, was responsible for establishing, implementing, and enforcing MCSO policies and procedures governing the training and supervision of MCSO deputies, including policies concerning arrests, fugitive investigations, residential entry, searches and seizures, electronic devices, custodial questioning, and cooperation with outside law-enforcement agencies.

141. A governmental entity may be liable under 42 U.S.C. § 1983 where a failure to train or supervise its employees amounts to deliberate indifference to the constitutional rights of persons with whom those employees come into contact and the deficiency is a moving force behind the constitutional injury. *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

142. Sheriff Woods had actual or constructive notice of the need for adequate training

and supervision concerning constitutional safeguards governing:

a. warrantless entry into private residences;

b. arrest and detention of persons pursuant to out-of-state fugitive matters;

c. searches and seizures of cellular telephones and other electronic devices;

d. custodial interrogation and the acquisition of information from persons in law-enforcement custody;

e. investigative cooperation with out-of-state law-enforcement agencies; and

f. the obligation of deputies to comply with MCSO's own written constitutional safeguards governing warrants, fugitive arrests, searches, and electronic-device evidence.

143. MCSO's own written policies and legal directives demonstrate that MCSO recognized the constitutional and legal risks associated with these areas of law-enforcement activity. MCSO Policy 4042.00 required deputies handling arrest warrants and fugitive matters to verify the subject's identity, the underlying charge or warrant, applicable bond information, and the originating agency's agreement to extradite.

144. MCSO Policy 4252.00 likewise required constitutional compliance in criminal investigations, including adherence to constitutional limitations governing interviews, custodial questioning, searches, arrests, and the assertion of constitutional rights.

145. The policy further required confirmation through appropriate documentation and provided that, if the originating agency would not extradite, the arrest should not be made. Section 4042.80 specifically required additional verification and documentation for fugitive arrests, including confirmation of the charge and agreement to extradite. MCSO Legal Bulletin 2022-18 separately required a warrant to search a cellular telephone even where the telephone had been lawfully seized.

146. Despite those safeguards, MCSO deputies allegedly entered Plaintiffs' residence without a warrant, consent, or exigent circumstances; arrested and detained Duvall; interrogated him in connection with the Texas investigation; seized his cellular telephone; obtained his telephone password; and placed the telephone in a Faraday bag for transfer to the League City Police Department.

147. Plaintiffs allege that these events demonstrate not merely the existence of written MCSO policies, but a failure to adequately train, supervise, monitor, and enforce those policies in the circumstances in which MCSO deputies were actually operating. The alleged conduct occurred despite written directives specifically addressing the same subjects, including fugitive-warrant verification, extradition confirmation, residential entry, and warrant requirements for cellular-device searches.

148. Upon information and belief, before March 7, 2025, MCSO and its policymakers had received notice, through prior complaints, civil-rights litigation, administrative proceedings, judicial proceedings, and other reports, concerning alleged unconstitutional arrests, searches, seizures, failures to follow constitutional safeguards, and deficiencies in the training or supervision of MCSO personnel.

149. Plaintiffs presently lack access to the internal MCSO records necessary to identify the full scope, number, circumstances, disposition, and supervisory response to those prior incidents because those records are within Defendants' possession, custody, or control. Plaintiffs therefore plead these facts upon information and belief and will amend or supplement these allegations as discovery permits.

150. Plaintiffs further allege that the need for adequate training and supervision was particularly apparent where MCSO deputies were acting in coordination with an out-of-state law-enforcement agency and were being asked to investigate, arrest, interrogate, and seize property

from a Florida resident in connection with an investigation originating outside Florida.

151. Sheriff Woods' failure to adequately train and supervise MCSO personnel in these areas, despite notice of the need for appropriate constitutional safeguards, amounted to deliberate indifference to the constitutional rights of persons with whom MCSO deputies came into contact.

152. The failure to train and supervise was a moving force behind the constitutional violations alleged in Counts I through III, including the unlawful entry into Plaintiffs' residence, the unlawful search and seizure of Duvall's cellular telephone, and Duvall's unlawful detention and interrogation.

153. As a direct and proximate result of these failures to train and supervise, Plaintiffs suffered the injuries and damages alleged in Counts I through III, including property damage, loss of property, unlawful entry, unlawful search and seizure, unlawful detention, emotional distress, financial losses, and other damages recoverable under applicable law.

154. Plaintiffs are entitled to recover compensatory damages, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

**COUNT VII**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S.C. § 1983**
***(Against Defendants Shaw, Walton, Osthed, and Jean-Francois in Their Individual Capacities)***

155. Defendants Clayton Shaw, Walton, Osthed, and Jean-Francois acted under color of state law. Plaintiffs allege that these Defendants reached an understanding and acted in concert to advance an interstate investigation through coordinated law-enforcement activity in Florida that resulted in violations of Plaintiffs' constitutional rights.

156. A civil-rights conspiracy under 42 U.S.C. § 1983 requires an agreement between two or more persons to deprive a plaintiff of a constitutional right, an act in furtherance of the agreement, and resulting constitutional injury.

157. Plaintiffs allege the existence of an agreement based upon the specific

communications, coordinated investigative activities, and interagency actions documented in the MCSO records concerning the investigation of Duvall.

158. Detective Clayton Shaw, acting as a League City police detective, initiated the Texas investigation and requested assistance from MCSO concerning Duvall. The MCSO incident report identifies the matter as an "Assisting Other Agency" investigation, identifies Shaw as the Detective associated with the underlying Texas investigation, and documents communications between Shaw and MCSO personnel concerning the investigation.

159. The MCSO report further documents that Walton communicated with Shaw concerning how information could be obtained from Duvall without alerting him to the actual purpose of Shaw's investigation. According to the report, MCSO personnel determined that questioning Duvall concerning an alleged "swatting" report would provide a means of obtaining information during a purportedly non-custodial encounter without arousing his suspicion. Plaintiffs allege that Shaw and MCSO personnel knowingly employed this false or pretextual narrative as part of their coordinated investigative strategy, including to induce Duvall to provide access to information and property that he would not otherwise have provided had he been informed of the true purpose of the investigation.

160. The coordinated conduct continued after the January 8, 2025 encounter. Shaw obtained the Texas warrant that MCSO personnel identified as the basis for the March 7, 2025 effort to locate Duvall at his Florida residence. Walton and Osthed thereafter responded to the residence, entered the property, arrested Duvall, transported him to MCSO facilities, and participated in the seizure and handling of his cellular telephone.

161. During the March 7, 2025 encounter, MCSO personnel obtained Duvall's telephone password and placed his cellular telephone in a Faraday bag for preservation. The MCSO report stated that the telephone was to be submitted into evidence and transferred to the League City

Police Department. Plaintiffs allege that the planned transfer of the telephone to League City further demonstrates that the Florida seizure was undertaken as part of the interstate investigation initiated by Shaw.

162. These communications and coordinated actions support the reasonable inference that Defendants reached an understanding to use MCSO personnel to conduct investigative and law-enforcement activity in Florida in furtherance of the League City investigation, including obtaining information and evidence from Duvall and taking investigative actions that Plaintiffs allege violated their constitutional rights.

163. The objects of the coordinated conduct included, among other things:

a. obtaining information concerning Duvall and the Texas investigation without alerting him to the investigation's actual purpose;

b. using a false or pretextual “swatting” narrative to induce Duvall to provide access to his cellular telephone, electronic information, and other property under circumstances in which he was not informed of the actual investigative purpose;

c. obtaining and photographing information displayed through Duvall's cellular telephone;

d. locating and arresting Duvall in Florida pursuant to the Texas fugitive matter;

e. entering Plaintiffs' residence and taking Duvall into custody;

f. interrogating Duvall and obtaining access to his cellular telephone;

g. seizing and preserving Duvall's cellular telephone for transfer to League City; and

h. advancing the Texas investigation through evidence and information obtained through the coordinated Florida investigation.

164. Defendants committed overt acts in furtherance of the alleged agreement, including communications concerning the investigative strategy, coordination concerning Duvall's location and arrest, the March 7, 2025, entry into Plaintiffs' residence, Duvall's arrest and detention, the seizure of his cellular telephone, acquisition of his telephone password, and the preparation of his telephone for transfer to the League City Police Department.

165. Plaintiffs allege that Defendants' coordinated conduct resulted in the constitutional violations alleged in Counts I through III, including the unlawful entry into Plaintiffs' residence, the unlawful search and seizure of Duvall's cellular telephone, and Duvall's unlawful detention and interrogation.

166. The alleged agreement involved personnel from two separate law-enforcement agencies: Detective Shaw of the League City Police Department and MCSO personnel. Plaintiffs therefore allege that the agreement was not merely an internal agreement among employees of a single governmental entity, but an interagency understanding to advance the League City investigation through coordinated law-enforcement activity in Florida.

167. Plaintiffs further allege that the coordinated conduct was undertaken knowingly and intentionally and that each Defendant understood that the investigative activity would occur in Florida and would involve Florida law-enforcement personnel acting in furtherance of the Texas investigation.

168. As a direct and proximate result of the conspiracy and the acts committed in furtherance thereof, Plaintiffs suffered the injuries and damages alleged in Counts I through III, including unlawful entry, unlawful search and seizure, unlawful detention, property damage, loss of property, emotional distress, and financial losses.

169. The individual Defendants acted willfully, maliciously, or with reckless disregard for Plaintiffs' constitutional rights. Plaintiffs therefore seek punitive damages against the individual

Defendants to the extent permitted by law.

170. Plaintiffs are entitled to recover compensatory damages, punitive damages against the individual Defendants as permitted by law, costs, reasonable attorneys' fees under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## VI. DAMAGES

171. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs suffered actual, compensable, and continuing harm, including but not limited to:

a. property damage resulting from the forced entry into Plaintiffs' home;

b. emotional distress, anxiety, fear, humiliation, and loss of personal security;

c. out-of-pocket expenses incurred for counseling, mental-health treatment, and other related services, to the extent recoverable and incurred;

d. expenses incurred to repair or replace the damaged door, lock, and door frame and to implement reasonable security measures necessitated by Defendants' conduct;

e. loss of enjoyment, comfort, privacy, and peaceful use of Plaintiffs' home;

f. loss or deprivation of personal property and other economic losses resulting from Defendants' seizure and retention of property;

g. punitive damages against the individual Defendants to the extent permitted by law for conduct undertaken with reckless or callous indifference to Plaintiffs' federally protected rights;

h. reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988; and

i. pre-judgment and post-judgment interest to the extent permitted by law.

## PRAYER FOR RELIEF

172. **WHEREFORE,** for the foregoing reasons and pursuant to the Counts above,

Plaintiffs BRITNI WALSH and FRANKLIN EUGENE DUVALL JR. demand judgment against Defendants CITY OF LEAGUE CITY, SHERIFF BILLY WOODS in his official capacity, and KAILEIGH WALTON, HENRIK OSTHED, LEEF JEAN-FRANCOIS, and CLAYTON SHAW in their individual capacities, and award Plaintiffs for general, compensatory, and punitive damages, reasonable attorneys' fees and costs of suit with interest pursuant to 42 U.S.C. § 1988, and any further relief which the Court may deem equitable and just.

**JURY DEMAND**

173. Plaintiffs demand a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

Dated: October 3, 2026

**LLG NATIONAL LAW GROUP**

Robert S. Mactavish
Florida Bar Number 0596388
Phoenix Corporate Tower
3003 N. Central Avenue
Suite 685
Phoenix, AZ 85012
P: 575-517-6542
robert.mactavish@llgnational.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b)(3), this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court.

Robert S. Mactavish

**<u>Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing</u>**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: our firm's paralegal who helped write the initial draft of this pleading used Grammarly. Although it is AI, it is not generative AI and only deals with grammar, spelling, sentence structure, etc. Grammarly does not generate content. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury I could be referred for criminal prosecution if the statements I make here are false.



Robert S. Mactavish